Argued June 30; affirmed July 19, 1932

# FERGUSON *v.* FERGUSON

### (13 P. (2d) 351)

*Oscar Hayter,* of Dallas (Arthur Clarke, of Corvallis, on the brief), for appellant.

*W. C. Winslow,* of Salem, for respondent.

■ BROWN, J. From the plaintiff's lips comes a sordid story of cruel acts committed by the defendant that marred her married life. It is shown by the record that she had long deliberated upon the question of leaving the defendant and seeking a divorce, but that she had from time to time deferred such action. Upon being asked by counsel to state what had brought about

her decision to execute her plan to go on the particular day when she finally departed for her parents' home with the minor children, she testified:

"Because I finally—at that time I wouldn't give him that morning what he was determined he was going to have, and he worked with me for some time and he didn't get it, and then he jumped out of bed and come around the bed and began cursing and swearing.

"Q. You refer to the sexual relations? A. He told me what he was going to tell dad.

"Q. Say what he said, Mrs. Ferguson. * * * A. He says, 'When I get out there to pay your dad all I owe him, I will tell the God damned old fool what I think of him, why don't he mind his own business, not be bothering himself with my business,' and 'old son of a bitch.' "

In addition, she said:

"Whenever he would get mad for little or nothing he would swear and curse, it would make no difference who was there."

Plaintiff then testified that the defendant was hostile toward the workers in the church, and that he objected to her being immersed by a certain minister. As to what took place after her immersion, she testified:

"I drove up there in front of the filling station (conducted by defendant), and I says: 'Well, I was immersed today.' Well, he looked at me, and he turned just as white as a sheet, and he says: 'I thought I told you you wasn't to be immersed by that God-damned crowd.' Well, I told him the circumstances, how it happened, and how they begged me to go and do it and finally I did. I didn't really see any harm in it, and as I wanted to be immersed I just went ahead and done it, and he says: 'You can put that God-damned car in the garage, and God damn you, go in the house and pack up your traps and leave.' "

Again asked by counsel concerning the defendant's ability to "curse and swear," witness thus detailed his actions growing out of a game of cards played by them with plaintiff's father and mother, wherein defendant became angry because he appeared to have been a loser:

"He cussed and swore and tore around there for I don't know how long. We all tried to quiet him and told him he shouldn't talk like that, and he says God damn it, he guessed he had a right to do what he wanted to in his own house."

She related other incidents indicating a fiery temper and showing habitual use of profanity. She further claimed that he was lazy, and testified that, on one occasion, when she wanted to purchase some meat for dinner and procure other necessities, she asked him for five dollars, and "he just blew up, and * * * he says, 'God damn it, I can't get ahead nothing. You got to always have some money. It's funny,—if I ever get anything ahead, you're all the time asking for money.' And he took a five-dollar bill out of his pocket, 'Here, take that, God damn it, and get out of here. You just better go home and pack up your traps and leave.' "

It is asserted that the defendant had an evil tongue, and in support of this charge witnesses were called who testified that the defendant had said "that ninety per cent. of the women of Spruce street were whoring around, and the other ten per cent. were but hadn't been caught yet."

■■ Plaintiff asserts that the defendant's excessive demands upon her for sexual intercourse constituted the greatest difficulty between them. The record teems with evidence that the defendant seems to have regarded woman as a breeding machine. Plaintiff's testimony in regard to such abuse is corroborated by the

testimony of Doctor Morse, a physician of high standing. And it is further clinched by the testimony of the defendant himself. That the defendant abused his wife in this regard is conclusive.

The defendant asserts in his counter-charge that the plaintiff and one H. J. Prosser were unduly interested in each other. There is testimony of different witnesses pointing to suspicious acts on the part of plaintiff and Prosser, but the most that can be said of such acts is that they were "suspicious." Actual proof of any wrongful conduct on the part of plaintiff and Prosser, himself a student of the Bible and a minister, is lacking. It seems, however, that there may be some merit in the defendant's contention that Rev. Prosser was a self-appointed comforter to Mrs. Ferguson in her domestic troubles. As indicating the defendant's attitude toward preachers in general, and toward Rev. Prosser in particular, we note from Prosser's testimony that, on one occasion after he had brought an evangelist named Word to the home of plaintiff and defendant, the defendant stated to him:

"The next time you bring a preacher to my house, I will kick you and the preacher both out."

to which he answered:

"I says, 'Johnny, you don't have to wait for me to bring any preacher to your house. If you want to kick me out you can do it right now.'

"Q. What did he say? A. He didn't say nothing, he couldn't say nothing, because I started to his house to have him kick me out."

Concerning the evangelist just mentioned, the defendant testified:

"I told her (defendant's wife) * * * that I didn't think much of him as a minister as he had related to me something of his activities; that he said he

had been a sailor in the navy and sailed the seven seas, and intimated he had a wife in every port as the saying went, and that he drank, and that he had been a prize fighter, and I told him then and there he had led his wild life and sowed his wild oats, and now he was trying to cover up his bad deeds under cover of the Church, and I didn't think much of him.''

The defendant stated that his objection to his wife's immersion by Evangelist Word was based upon his past record as related above. However, for this attack upon the early history of the evangelist defendant has no supporting proof.

The story told by defendant of his conduct following his wife's immersion differs materially from the plaintiff's account thereof. The defendant testified:

''She said she had been over to Toledo and had been immersed, and I says, 'who immersed you?' and she says, 'Rev. Word.' * * * 'Why!' I said, 'Did you have that fellow immerse you?' And she says, 'Yes,' and I says, 'I thought I asked you not to.' And she says, 'I was over there and they was going to immerse a bunch, and Elroy wanted me to go along, so,' she says they fitted her up with an outfit and she went and was immersed; and I told her to 'get out of here.' I says, 'I don't want you around here at all.' ''

He then explains that he did not demand that she leave home, but that he told her to get out of the camp ground where he was at work.

Keezer on Marriage and Divorce, § 111, states the following well-settled principle of law:

''It is a fundamental principle governing the marriage relation, that one of the reasons for the existence of marriage is the necessity for the proper regulation of the natural, sexual desires, and any conduct on the part of a husband or wife which shall interfere with or prevent such proper sexual relation is reprehensible, and, generally, a ground for divorce, either alone

or as forming the basis for a charge of cruelty, or cruel treatment such as would endanger health—a cause for divorce becoming of wider application and construction of the law under modern decisions. This abuse of the sexual relation may be an excessive and abusive indulgence by the husband, where the intercourse is of such a nature or quantity as to injure the health of the wife. But where there is no injury to health or reason for fear of such injury, such excesses will not constitute cause for divorce.''

At section 112 the distinguished author says in part:

''The tendency of modern decisions, reflecting the advanced civilization of the present age, is to view marriage from a different standpoint than as a mere physical relation. It is now more wisely regarded as a union affecting the mental and spiritual life of the parties to it, a relation designed to bring them the comfort and felicities of home life, and between whom, in order to fulfill such design, there should exist mutual sentiments of love and respect.''

In 9 R. C. L., § 134, "Divorce and Separation," it is said:

''What may or may not constitute intolerable cruelty by a husband towards his wife in the exercise of his marital rights is a difficult and delicate question. * * * It has been declared that forcing a wife to submit to excessive sexual intercourse may constitute cruelty; that humanity demands that such complaints be heard; that the wife protecting her life from the ungovernable lust of her husband by seeking a divorce presents as strong a case for relief under the law as when she flees from his intolerable cruelty inflicted by brute force. * * * The fact of excessive sexual intercourse may be shown by the wife's testimony * * *.''

To similar effect, see 19 C. J., p. 55, § 105(b).

■ We have read the record in this case with care; and after mature deliberation as to the weight of the evi-

dence, we must conclude that the defendant and cross-complainant, although frank and honest as a witness, has failed to make his case. Upon the other hand, while the plaintiff has failed to prove most of the allegations of her complaint, yet the testimony adduced on her behalf, clearly indicating the abuse by the defendant of his marital rights, is sufficient to entitle her to a divorce.

The decree rendered by the lower court is hereby affirmed.

BEAN, C. J., BELT and CAMPBELL, JJ., concur.